ORIGINAL

IN THE UNTIED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JAN 30 2007

CLERK, U.S. DISTRICT COURT
By_____
      Deputy

| | | |
|---|---|---|
| RAYMOND FIALA, individually and as representative of the Estate of Michael Fiala, | § § § § | |
| Plaintiff | § § | |
| vs. | § § | Civil Action No. _____ |
| JAMES E. SMITH, Superintendent, North Texas State Hospital—Vernon Campus, in his individual capacity; | § § § § | **7-07CV-023-R** |
| SUSAN JANSA, RN, in her individual capacity; | § § § | |
| ANN OWENS, RN, in her individual capacity; | § § § | |
| AMBER RIDDLE, mental health worker, in her individual capacity; and | § § § | |
| MICHAEL FONTENOT, mental health worker, in his individual capacity, | § § § | |
| Defendants | § | **JURY DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, by and through the undersigned counsel, respectfully files this Original Complaint, and would show:

INTRODUCTION

1.      On the evening of February 8, 2005, Michael Fiala, a patient at North Texas State Hospital's Vernon Campus ("Vernon"), was assaulted by Defendant Michael Fontenot, a mental health worker with a known history of abusing patients. For the next ten hours, Michael lay dying on the floor of a seclusion room, his brain hemorrhaging, unable to get assistance. Despite his obvious

distress and neurological impairment, no one helped him or bothered to enter the room, which was monitored at the nurse's station, just a few feet away.  Even after someone finally looked in on Michael at about 7:30 a.m. the next morning, February 9, he was not taken to Wilbarger General Hospital for another two and a half hours, until about 10:00 a.m.  He arrived in critical condition. The next day, February 10, Michael died from the assault, abuse, and injuries he endured at Vernon. He was 35 years old.

2.       In addition to the fatal blunt force trauma to the head, Michael endured other blunt force injuries while at Vernon.  The Medical Examiner who conducted his autopsy noted that Michael had a "large area of bruising over the lower part of his abdomen and pelvis, down to his genitals, down his right thigh onto his right buttock and the back of his thigh; just a whole wide area of skin damage and bruising."  The Medical Examiner determined that these bruises were "blunt force" injuries.

3.       Plaintiff Raymond Fiala, as father, legal heir, and statutory beneficiary of Michael Fiala, files this Complaint for actual and punitive damages, as well as funeral and burial expenses, pre- and post-judgment interest, attorney's fees, and court costs.

4.       Plaintiff alleges that Defendants' acts and omissions directly and proximately caused Michael Fiala harm, injury, conscious pain and suffering, and death.

5.       Further, Plaintiff alleges that Defendants' acts and omissions directly and proximately caused Plaintiff to suffer, and continue to suffer, injury to the father-son relationship, including loss of society, companionship, comfort, happiness, and love.  Plaintiff Raymond Fiala also suffers from mental anguish, grief, and sorrow, which he is likely to continue to suffer for the remainder of his days.

JURISDICTION AND VENUE

6.      This civil action is authorized by 42 U.S.C. § 1983 to redress the deprivation under color of law of rights guaranteed by the United States Constitution.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).  This Court has supplemental jurisdiction to consider Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

PARTIES

8.      Plaintiff Raymond Fiala, father of Michael Fiala, sues in his individual capacity and as the representative of his son's Estate.  Raymond Fiala resides in Moody, Texas, in McLennan County.

9.      At all relevant times, Defendant James E. Smith was the Superintendent of North Texas State Hospital—Vernon Campus, and was acting under color of law.  As Superintendent, Defendant Smith supervised all Vernon staff and was responsible for ensuring that Vernon was in full compliance with federal and state law, department or agency policies, rules, and regulations, and related standards of care.  Defendant Smith, as Superintendent, was ultimately responsible for ensuring the health, safety, and welfare of all of Vernon's patients, including Michael Fiala. Defendant Smith was also ultimately responsible for the hiring, retention, discipline, and supervision of the other Defendants, including Defendant Michael Fontenot.  Defendant Smith is sued in his individual capacity and may be served process at the North Texas State Hospital, 6515 Lake Road, Wichita Falls, Texas 76308.

10.     At all relevant times, Defendant Susan Jansa was a registered nurse at the North Texas State Hospital—Vernon Campus, and was acting under color of law.  At Vernon, Defendant Jansa was responsible for Michael Fiala's medical needs, care, and safety.  Defendant Jansa is sued in her individual capacity and can be served at the North Texas State Hospital—Vernon Campus, 4730 College Drive, Vernon, Texas 76385-2231.

11.     At all relevant times, Defendant Ann Owens was a registered nurse at the North Texas State Hospital—Vernon Campus, and was acting under color of law.  At Vernon, Defendant Owens was responsible for Michael Fiala's medical needs, care, and safety.  Defendant Owens is sued in her individual capacity and can be served at the North Texas State Hospital—Vernon Campus, 4730 College Drive, Vernon, Texas 76385-2231.

12.     At all relevant times, Defendant Amber Riddle was a mental health worker at the North Texas State Hospital—Vernon Campus, and was acting under color of law.  At Vernon, Defendant Riddle was responsible for Michael Fiala's care and safety.  Defendant Riddle is sued in her individual capacity and can be served at the North Texas State Hospital—Vernon Campus, 4730 College Drive, Vernon, Texas 76385-2231.

13.     At all relevant times, Defendant Michael Fontenot was a mental health worker at the North Texas State Hospital—Vernon Campus, and was acting under color of law.  As Vernon, Defendant Fontenot was responsible for Michael Fiala's care and safety.  Defendant Fontenot is sued in his individual capacity and can be served at the North Texas State Hospital—Vernon Campus, 4730 College Drive, Vernon, Texas 76385-2231.

## FACTUAL ALLEGATIONS

14.     Michael Fiala ("Michael") was admitted to North Texas State Hospital, Vernon Campus ("Vernon"), on July 12, 2004, as a transfer from Austin State Hospital. Michael was transferred to Vernon pursuant to a court order committing him for extended mental health services. The commitment was to expire on July 1, 2005.

15.     On February 9, 2005, Michael Fiala died from blunt force trauma of the head, fatal injuries he received at Vernon while in the care, custody, and protection of Defendants. Michael Fiala was just 35 years old.

16.     At Austin State Hospital, Michael was diagnosed as having mental illness and mild mental retardation.

17.     At admission to Vernon, Michael was five feet eleven inches tall, and weighed only 147 lbs. Lamingus Maytubbie, a mental health worker at Vernon who knew Michael, described him as a "real slim, slender person, [who] didn't have much strength. I mean real small, kind of frail . . ."

Evening of Trauma: February 8, 2005

18.     The hallways of the North Pines Unit where Michael resided at Vernon are monitored by cameras, as is the Unit's seclusion room. These cameras, and their recordings, captured the events as they occurred before and after Michael was assaulted.

19.     On or about February 8, 2005, at or about 8:30 p.m., Michael walked to the nurse's station to get his night medications. The registered nurse who gave Michael his medications, Defendant Susan Jansa, stated that she did not notice anything "abnormal" about Michael at this time, that he was walking and reacting normally, and that he used both hands to take his medications.

20.     At or about 8:51 p.m. that same night, Michael left the seclusion room, where he had been sleeping, to go take a shower. On his way to the shower, Michael went to his room, no. 154. Defendant Michael Fontenot, a mental health worker with a known history of abusing patients, followed Michael into his room. Michael's roommate, Bobby Pinson, also entered and exited the room, then remained at the doorway, looking into the lighted room.

21.     According to Pinson, Defendant Fontenot assaulted Michael at this time. Pinson stated that Defendant Fontenot hit Michael multiple times, all over, on his face, chest, and stomach.

22.     Michael left his room and went to the shower area, with Defendant Fontenot following him. Bobby Pinson went back into room 154.

23.     At the shower area, Defendant Fontenot opens the shower door for Michael, then sits in a chair to observe. Defendant Amber Riddle, another mental health worker, then joins Defendant Fontenot in the shower area.

24.     At or about 9:11 p.m., Michael leaves the shower area and returns to his room. Defendant Fontenot again follows Michael into Michael's room. This time, the room's lights are off.

25.     On information and belief, while Michael and Defendant Fontenot are in Michael's room, Fontenot again assaults Michael. Bobby Pinson, who was present, stated that Defendant Fontenot threw Michael onto the end of the bed. A square bruise on the lower part of Michael's abdomen matches the square bedpost of one of the beds in the room.

26.     Further, while Michael and Defendant Fontenot are in Michael's room, Defendant Riddle stated she heard a "faint scream or holler" from Michael coming from the room. Defendant Riddle said the scream sounded like someone in pain.

27.     A minute or so later, at or about 9:12 p.m., Michael leaves his room, and his pants are down. He pulls his pants up, and goes straight to the seclusion room.

28.     Although Defendant Riddle heard Michael "scream" or "holler" in pain, she did not report it to anyone, as required by law, or even bother to check on Michael.

29.     Staff member Lamingus Maytubbie stated that he also heard Michael "screaming," and when he went "to see what was going on," he saw Michael and Defendant Fontenot coming out of the room. Michael "had his pants down and Mr. Fontenot asked, 'Did you hear me hit him?'" Maytubbie answered, "No."

30.     Defendant Fontenot later admitted that Pinson did not cause any injuries to Michael, and that Michael did not injure himself. In addition, the videotapes for the preceding 24 hours establish that the only time Michael was alone with a staff member off camera were the two times that he was with Defendant Fontenot in his bedroom.

31.     After Defendant Fontenot asked Maytubbie if he had heard him hit Michael, Maytubbie relayed Fontenot's statement to Defendant Susan Jansa, RN. In response to Maytubbie's report, Defendant Jansa, who was Defendant Fontenot's supervisor and, as the registered nurse, in charge of the Unit, did nothing; she simply left Vernon when her shift ended at 11:00 p.m. without notifying the Texas Department of Family and Protective Services (as is required by law following an allegation of abuse), without speaking with or physically checking on Michael, and without speaking with Fontenot.

32.     Defendant Jansa did nothing even though she was aware of evidence that Michael may have suffered prior abuse; Jansa confirmed that she had personally seen, and was long aware of bruises "all over" Michael Fiala, including his pelvic area.

7

Night Spent Suffering in the Seclusion Room

33.     At or about 9:00 p.m., Defendant Ann Owens, RN, replaces Defendant RN Jansa. As the registered nurse on duty, Defendant Jansa is in charge of the Unit and is responsible for ensuring Michael's care and safety.

34.     The seclusion room is lighted, and is watched by a camera, which is monitored by the nurses in their station. The nurses' station is only twelve to fifteen feet from the seclusion room, just across the hallway. Defendant Jansa stated that, as part of the nurses' job, they must watch the monitors showing the seclusion room.

35.     At or about 9:13 p.m., following the assaults, Michael enters the seclusion room, the door closes, he drops to his knees, and falls to his left side. Michael sits up, then falls to his right side, and lies there.

36.     At or about 9:15 p.m., Michael sits up, puts his head in his hands, drops his right hand, places his head in both hands, then drops both hands. At or about 9:16 p.m., Michael raises his hands to his head, then drops them. At or about 9:18 p.m., Michael sits up, holds his head, then falls to his left side.

37.     At or about 9:25 p.m., Michael tries to sit up, using both hands to push himself into a sitting position. He is unstable and his left hand is on his forehead. At or about 9:29 p.m., Michael continues to try to sit up. At or about 9:31 p.m., Michael holds his head with both hands and tries again to sit up.

38.     At or about 9:36 p.m., Michael's left hand falls from his head to his chest and his fingers curl inward. He lies on his back, his right hand under his head, his left hand on his chest, with his mouth open. At or about 9:52 p.m., Michael brings his right hand to his chest. The door to

8

the seclusion room opens slightly, but no one enters to check on Michael. Michael's right hand is fidgety, touching his head and his chest.

39.     At or about 10:01 p.m., and for several minutes thereafter, Michael, who is still on the floor, touches his head with his right hand, with his left hand resting on his chest. At or about 10:13 p.m., Michael's right hand continues to fidget, and he uses it to touch his head and hold his left hand. At or about 10:41 p.m., Michael draws up his left leg. His right hand continues to shake.

40.     At or about 11:02 p.m., Michael holds his head with his right hand, then touches his left arm. Michael continues to touch his head with his right hand over the next hour.

Midnight to 6:00 a.m., February 9, 2005

41.     From at or about midnight until 1:00 a.m., Michael is almost continually moving his right hand to touch or rub his head, right thigh, and abdomen.

42.     For the next three hours or so, Michael continues to move his right hand or his fingers on that hand, and often moves his hand from his head to his abdomen. Only occasionally does Michael move his legs.

43.     At or about 4:31 a.m., Michael, incontinent and unable to get up, urinates on himself. Michael continues to move his right hand and leg. At or about 5:20 a.m., Michael moves his right hand to his face and head. He rubs his head with his right hand and rocks from side to side.

6:00 to 8:00 a.m.

44.     At or about 6:00 a.m., Michael continues to touch his head and his pants with his right hand. At or about 6:22 a.m., Michael tries to roll onto his left side, but is unable to.

45.     At or about 6:31 a.m., Michael is touching his head, and extending his arm towards the door to the room. He is looking at the door and he tries to roll to his right side, but is unable to.

9

Michael continues to touch his head and extend his right arm; he tries to roll onto his right side, but again is unable to.

46.     At or about 6:45 a.m., RN Dennis Baker arrives to the Unit for shift report. RN Baker stated that "[i]t was noted that [Michael] had slept in the [seclusion] room for the night, and he was pale-colored that morning," and that this was "[n]ot normal" for Michael.

47.     At or about 6:52 a.m., someone comes to the doorway of the seclusion room, but turns away.

48.     At or about 6:56 a.m., someone again appears at the doorway, but again turns away.

49.     At or about 7:13 a.m., someone again appears at the doorway.

50.     At or about 7:15 a.m., Staff Rudy Cardona enters the seclusion room. Even though the seclusion room was monitored, Cardona is the first person to enter and check on Michael since he collapsed ten hours earlier. Cardona takes Michael's right hand and pulls him up to a sitting position. When Cardona lets go of Michael, he falls back against the wall. After about two minutes, Cardona leaves the room.

51.     At or about 7:18 a.m., someone again appears in the doorway of the seclusion room, but does not enter.

52.     At or about 7:29 a.m., some 15 minutes since he left Michael leaning against wall, Cardona reenters the seclusion room, and again pulls Michael into a sitting position.

53.     At or about 7:33 a.m., Cardona brings breakfast to Michael, placing a tray on his lap and a bowl and glass to his left, and places a utensil in his right hand. At or about 7:40 a.m., LVN Debra Smith enters the seclusion room and staff Tim Miller follows. LVN Smith gives medication

to Michael, and Smith and Miller leave.  While giving Michael his medication, Smith observed that, "he could not hold the med due to his hands shaking."

54.     At or about 7:44 a.m., staff Herron Jackson enters and tries to feed Michael.  A few minutes later, she leaves.

55.     At or about 7:53 a.m., Jackson and RN Donna Watson enter the seclusion room and try to speak with Michael.  RN Watson stated that she observed Michael sitting against the wall, with his left lip slanting downward, and his left hand turning inward.  She asked Michael how he was feeling, and he replied, "Michael Fontenot just beat me up."  According to RN Watson, when asked again, Michael reiterated that, "Michael Fontenot just beat me up."  A few minutes later, RN Watson leaves the seclusion room, reenters, then leaves again.  In her nursing notes, RN Watson wrote that she observed Michael "being fed by staff and saliva coming out of left side of mouth."  RN Watson also noted "weakness to left extremities," that Michael was "unable to stand," and that he was "voiding on self x2."  RN Watson wrote that "Dr. Childs informed of status," and that he informed her to send Michael to sick call "this a.m.," and to call Dr. Patel.  RN Watson called Dr. Patel, who said he would see Michael at "11:00 this a.m. in office."

8:00 to 9:00 a.m.

56.     At or about 8:00 a.m., staff Tammy Montgomery enters the seclusion room and, along with Jackson, try to stand Michael up.  Unable to stand, Michael is lowered back to the floor in a seated position.  Montgomery and Jackson leave the seclusion room a few minutes later.

57.     At or about 8:02 a.m., Cardona enters the room, followed by Montgomery and Jackson, who have brought in a wheelchair.  Jackson and Cardona lift Michael into the chair.  Staff Don Wright is standing in the doorway.

58.     At or about 8:09 a.m., almost an hour after someone finally looked in on Michael and found him injured, Jackson takes his temperature and blood pressure.

59.     At or about 8:30 a.m., staff Wright, who was told to take Michael to a meeting at 8:30, tried to change Michael's pants, which needed changing. In so doing, staff Wright tipped over the wheelchair. Wright called for help and Michael was lifted back into the wheelchair. Wright stated that he became more concerned about Michael "because he was not only drooling, but a lot of mucus was coming out of his nose." Miller also stated that at this time Michael was "unresponsive," that he was "drooling," that mucus was coming from his nose, and that "he could not stand up on his own and had to be lifted and placed in the chair." A few minutes later, Michael, incontinent, urinates in the chair.

60.     Wright, Miller, and Cardona then remove Michael from the chair, lay him on the floor, and change his pants, at which time Wright "saw what looked to be a lot of old bruises around [Michael's] groin area, and what looked to be . . . fresh bruises on his thigh." At this time staff Montgomery also noticed that Michael "had several bruises." Montgomery stated that the "groin area was a very large dark bruise and [Michael] had two more bruises on his thigh that appeared to be new, judging by the color," and that "he also had multiple other bruises on other areas of his body that had a greenish/yellow coloring." Staff Miller stated that they "saw bruises in the pubic area from his hips to his knee," and that "there were bruises on both arms by the shoulders." After Michael was changed and dressed, he was put back in the chair. A few minutes later, Michael urinates again. Again, Michael is changed and redressed.

61.     Also at or about 8:30 a.m., RN Baker arrives, and sees RN Watson between the seclusion room and the nursing station. Watson asked Baker to assess Michael, and she tells him

that she thinks Michael may have had a stroke.  RN Baker stated that Michael's upper lip was swollen, with two abraded spots on the inside of his lip, and that he "was not responding well to verbal stimulus . . . ."  RN Baker further stated that there was food in Michael's mouth, and he was told that staff had tried to feed him, but that Michael would not place food in his mouth.  RN Baker noted that Michael's left hand was "weak and uncontrolled," weakness which Baker "verified by hand strength assessment."  RN Baker then left Michael and spoke with RN Watson outside the room, at which time he agreed Michael could have suffered a stroke, or that it "[c]ould be trauma to the head."  In his nursing notes, Baker wrote that he "was requested to look at patient @ 8:30 this morning whereas I noted multiple bruising and somewhat comatose patient."  Baker also noted that Michael's left side was "weak," and that he was "not responding coherently to verbal stimuli."

62.     At or about 8:47 a.m., Dr. Allen Childs approached, and was asked to assess Michael.  RN Baker stated that Dr. Childs "stated immediately, 'Looks like a stroke.'"  Dr. Childs then tells RN Watson to call Dr. Patel.  Michael did not see Dr. Patel until about 9:40 a.m, almost an hour after Dr. Childs stated that Michael looked like he had a stroke, and almost two and a half hours after someone finally went into the seclusion room to check on him.

63.     After Dr. Childs left, RN Baker noticed that Michael "became incontinent," and asked staff to change him.  Baker stated that it was then that he "noticed a large amount of bruising to Mike's lower torso."  Staff Cardona assisted in changing Michael's pants, at which time he noted that "we could see that [Michael] had a big area over his private area that looked like a black spot, and over the side of his left leg, a bruise about 14 inches long, and we looked at him and we all got concerned that he was abused so much."  Cardona added that Michael "had bruises all over his body."  RN Watson also saw the bruising on Michael's "pelvic area."

9:00 to 10:00 a.m.

64.    RN King arrived at the seclusion room shortly after 9:00 a.m., at which time he touched Michael and called his name, but got no response.  RN King stated that Michael "was breathing with difficulty," his pupils were "sluggish to respond to light," that he "was drooling and had been incontinent of bladder," and that his "upper extremities were flaccid." RN King stated that, "at this point, I went to the phone and called Dr. Patel and requested he see Michael as soon as possible and he gave orders to transfer Michael to the Holly's treatment room."

65.    Upon being transferred to the Holly's treatment room at or about 9:40 a.m., Dr. Patel, after a quick examination, determined that Michael should be sent to the emergency room at Wilbarger General Hospital.  RN King, who was present in the treatment room, stated that he had to suction Michael because he was producing "thick, white secretions, which he couldn't swallow or expectorate." Dr. Patel stated that upon arrival to the treatment room, Michael "was not responsive, except to deep stimuli," and that he "had lost all reflexes including swallowing."  Dr. Patel's "impression was intracranial bleed or subdural [and] active bleed." While in the treatment room, RN Baker showed RN King and Dr. Patel the bruising that covered Michael's "groin and genital area."

66.    RN Baker called Wilbarger General Hospital at or about 9:50 a.m., and spoke with Betha Rutledge, RN.  RN Rutledge stated that RN Baker "apologize[d] for the condition of the patient . . . in regards to multiple bruises and he was unable to give any explanation for the bruises."

67.    An ambulance finally arrived to take Michael to the Wilbarger General Hospital, in Vernon, at or about 9:55 a.m., more than twelve hours after he was assaulted and sustained his fatal injuries.

Wilbarger General Hospital

68.    On Wilbarger Hospital's Emergency Nursing Record, the nurse noted that there was "no documentation from state hospital regarding multiple bruising on body." The nurse adds that Dr. Childs stated that "pt [Michael] has been in several 'episodes' last 2 weeks." At Wilbarger General Hospital, Michael was diagnosed with a subdural hemotoma, and was evacuated by air to United Regional Health Care System ("United Regional"), in Wichita Falls.

United Regional Health Care System

69.    Michael was admitted to United Regional at or about 12:45 p.m., in critical condition from the blunt force injuries he sustained the previous evening at Vernon. His pupils were unequal, he was not alert, awake, or responsive, and had no withdrawal to pain. United Regional's diagram of Michael's body noted a swollen mouth, laceration to the back of his head, and bruises on his back, the back of his thigh, his knees, his pelvis, and his left thigh.

70.    After admission to United Regional, Dr. Sanjoy Sundaresan operated on Michael, after which he was taken to the Intensive Care Unit in critical condition. Dr. Sundaresan stated that Michael had a "large subdural hematoma"; he estimated the hematoma was 100 CCs of blood. After observing the videotape of Michael's night in the seclusion room from February 8 and 9, 2005, Dr. Sundaresan stated that Michael's "behavior was not of a normal person," and that Michael "was neurologically impaired" during the time he was in seclusion room.

71.    The next day, February 10, 2005, Michael Fiala died from the blunt force trauma to the head that he had received on February 8, 2005, while in Vernon's custody and care.

72.    An autopsy was conducted the next day, February 11, by Marc Krouse, M.D., Deputy Chief Medical Examiner with the Tarrant County Medical Examiner's Office. Dr. Krouse

15

determined that the cause of Michael's death was "Blunt Force Trauma of Head." This determination was in accord with the opinion of the neurosurgeon, Dr. Sundaresan, who also stated that Michael suffered blunt force trauma to the head. Dr. Krouse explained that blunt force trauma to the head means that "an impact occurred that had caused a violent acceleration of [Michael's] head," and that "as a result of that impact hemorrhage or bleeding had occurred on top of the surface of his brain, that this had built up pressure interfering blood flow, and it also caused a mass effect, that is, it pushed his brain so that everything was distorted and further interrupted blood flow and eventually caused his death."

73.     Like Dr. Sundaresan, Dr. Krouse, after watching the videotape of Michael in the seclusion room, concluded that "from the time the videotape starts [at or about 9:09 p.m.] when he's in that isolation room, padded room, that he's already sustained a significant head injury." Dr. Krouse states that Michael got "progressively worse" throughout the night, and by "2:00 or 3:00 in the morning . . . he's got virtually no capability of using his left leg."

74.     Dr. Krouse also found "multiple cutaneous ecchymosis [bruises] and contusions" on Michael's torso and extremities. Dr. Krouse stated that Michael had a large area of bruising over the lower part of his abdomen and pelvis, down to his genitals, down his right thigh onto his right buttock and the back of his thigh; just a whole wide are of skin damage and bruising." One area of bruising was 19 ½" x 25". Dr. Krouse determined that the bruises on Michael were also "blunt force" injuries.

Aftermath

75.     On February 9, 2005, the day Michael was transferred from Vernon to Wilbarger General Hospital, the Texas Department of Family and Protective Services ("DFPS") received a

16

report of alleged physical abuse of Michael Fiala by an unknown staff member at Vernon. DFPS conducted an investigation into the allegation of abuse, and issued its investigative report. In his report, investigator Gary Chapman confirmed the allegation of physical abuse (class 1, serious/sexual) against Defendant Fontenot.

76.     Defendant Michael Fontenot was criminally tried for the death of Michael Fiala in Vernon District Court in March 2006. Defendant Fontenot was acquitted, with the assistance of testimony from his former girlfriends Defendant Riddle and Donna Pate, both of whom worked at Vernon. Despite Fontenot's known history of abusing patients, and DFPS's confirmation of abuse, Defendant Smith, Superintendent of Vernon, also testified on Defendant Fontenot's behalf.

77.     On information and belief, three of the jurors who acquitted Defendant Fontenot also worked at Vernon.

Defendant Fontenot

78.     On information and belief, Defendant Fontenot failed the polygraph and drug tests he was given in connection to the criminal charges that were filed against him for the death of Michael Fiala.

79.     In contrast to Michael Fiala, Defendant Fontenot, at the time of the incidents forming the basis of this suit, was a large, strong man, six feet tall, and 220 lbs.

80.     Defendant Fontenot has admitted that he had been accused on at least two prior occasions of abusing patients at Vernon; the one incident he recalled involved hitting a patient.

81.     On information and belief, prior to Michael's death, there were actually more than a dozen allegations of abuse lodged against Defendant Fontenot. Defendant Fontenot also admitted

17

that he knew where the security cameras are placed at Vernon, and that the cameras could not see or record what happens in the rooms.

82.     Child Protective Services prohibited Defendant Fontenot, while he was in a relationship with Defendant Amber Riddle, from being alone with her infant son because the child had suspicious bruises in his abdomen and groin area.

83.     Despite all of the allegations of abuse made against Defendant Fontenot, Defendant Smith still permitted him to work with patients at Vernon.

84.     With Defendant Smith's knowledge and assent, Defendant Fontenot, even after the death of Michael Fiala, continues to work with patients at Vernon to this day.

<u>Abuse and Neglect of Michael Prior to February 8, 2005</u>

85.     RN Watson stated that she examined Michael on January 17, 2005, and found bluish-yellow bruises on both of his hips.

86.     Defendant Jansa, RN, stated that she had personally seen, and was long aware of bruises "all over" Michael Fiala, including his pelvic area.

87.     RN Robin Wells stated that she saw fresh bruising on Michael's right thigh and hip area, and faded bruises on his left hip, when she examined him on February 5, 2005.  At that time, she did not see bruising on his abdomen or pelvic area.  RN Wells called Dr. Patel to express concern that Michael's hip may have been broken.  RN Wells also reported the bruising to Defendant Owens, RN, who said she was already aware of it.  RN Wells also asked RN Jill Streit to assess Michael. RN Streit stated that she observed bruises to Michael's "right thigh, hip, and left groin area." At that time, February 5, 2005, RN Streit "observed no bruising to pubic or lower abdomen area." RN Streit recorded her assessment in progress notes and filed an injury report.

88.     Mental health worker Alana Patty reported to RN Wells that she had seen bruises on Michael prior to February 5, 2005.

89.     On February 6, 2005, Debra Smith, mental health worker, observed bruises on Michael's leg, and "a large amount of bruising to both hips." LVN Judy Nash was also present, and also observed the bruising. Dr. Patel also observed the bruising on Michael on February 6, 2005; Dr. Patel believed the bruises were two to three days old.

90.     On or about February 5, 2005, LVN Peggy Kaufman also "observed a large, dark purple bruise to [Michael's] thigh," and a brown and yellowish bruise on his inner left thigh. She also observed a "knot" on his right hip. LVN Kaufman did not observe any bruises on Michael's abdomen or groin at this time.

91.     Defendant Smith, Superintendent of Vernon, who knew or should have known of Defendant Fontenot's history of patient abuse, retained Fontenot, failed to properly supervise him, and allowed him, and continues to allow him, to care for patients at Vernon.

92.     Defendants Smith, Jansa, and Owens had responsibility for Michael's health, protection, safety, and welfare, as well as the concomitant right and duty to supervise and exercise control over Defendant Fontenot.

93.     Defendants Smith, Jansa, and Owens, by failing to exercise professional judgment, deprived Michael of his clearly established and well settled federal constitutional right to reasonable care and safety. Defendants' failure to exercise professional judgment directly and proximately caused Michael conscious pain and suffering, injury, and death.

94.     Defendants Smith, Riddle, and Fontenot were intentionally and deliberately indifferent to Michael's health, protection, safety, and welfare, thereby depriving him of his clearly

established and well settled federal constitutional right to bodily integrity. Defendants' intentional and deliberate indifference to Michael's health, protection, safety, and welfare directly and proximately caused him conscious pain and suffering, injury, and death.

95.     Pursuant to the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code §§ 71.021-022, Plaintiff Raymond Fiala, on behalf of his son's Estate, claims actual and punitive damages for the conscious pain and suffering endured by Michael Fiala prior to his death, as well as funeral and burial expenses, pre- and post-judgment interest, and court costs.

96.     Pursuant to the Wrongful Death Act, Tex. Civ. Prac. & Rem. Code §§ 71.001-011, Plaintiff Raymond Fiala claims actual and punitive damages, pre- and post-judgment interest, and court costs for his losses and for the wrongful death of his son. Plaintiff Raymond Fiala has suffered, and continues to suffer injury to the father-son relationship, including loss of society, companionship, comfort, happiness, and love. Plaintiff has also suffered mental anguish, grief, and sorrow, and is likely to continue to suffer such mental anguish, grief, and sorrow for the remainder of his days.

## CAUSES OF ACTION

### First Cause of Action: 42 U.S.C. § 1983
### Fourteenth Amendment to the U.S. Constitution – Right to Bodily Integrity

97.     Plaintiff hereby incorporates by reference paragraphs 1 through 96 of this Complaint.

98.     Defendants Smith, Riddle, and Fontenot, acting under color of law, intentionally and with deliberate indifference to Michael Fiala's health, welfare, protection, safety, and rights, deprived Michael Fiala of his constitutional right to bodily integrity. Defendants' deliberate

indifference to Michael Fiala's health, welfare, protection, safety, and rights directly and proximately

caused him great conscious pain and suffering, injury, and death.

**Second Cause of Action: 42 U.S.C. § 1983**
**Fourteenth Amendment to the U.S. Constitution – Right to Reasonable Care and Safety**

99.     Plaintiff hereby incorporates by reference paragraphs 1 through 98 of this

Complaint.

100.     Defendants Smith, Jansa, and Owens, acting under color of law, and by failing to

exercise professional judgment, deprived Michael Fiala of his substantive due process right to

reasonable care and safety.  Defendants' failure to exercise professional judgment and provide

Michael Fiala reasonable care and safety directly and proximately caused him great conscious

pain and suffering, injury, and death.

**Third Cause of Action: Texas Law**
**Assault by Infliction of Bodily Injury**

101.     Plaintiff hereby incorporates by reference paragraphs 1 through 100 of this Complaint.

102.     Defendant Fontenot intentionally, knowingly, maliciously, and/or recklessly made

contact with Michael Fiala, causing Michael Fiala to suffer physical pain, mental anguish, injury, and

death.

**ATTORNEY'S FEES**

103.     Plaintiff is entitled to recover his attorney's fees, costs, and expenses pursuant to 42

U.S.C. § 1988 and 42 U.S.C. § 12205.

**JURY DEMANDED**

104.     Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

THEREFORE, Plaintiff respectfully requests this Court to:

A.    Enter judgment against Defendants;

B.    Award actual and punitive damages consistent with the allegations of this Complaint

      as provided by law;

C.    Award pre- and post-judgment interest as provided by law;

D.    Award Plaintiff his attorney's fees, expenses, and court costs; and

E.    Grant all such other relief, in law or in equity, to which Plaintiff may be entitled.

Respectfully submitted,

PETER HOFER
Texas Bar No. 09777275
Attorney-In-Charge

BETH MITCHELL
Texas Bar No. 00784613

ADVOCACY, INC.
7800 Shoal Creek Blvd., Suite 171-E
Austin, Texas 78757
(512) 454-4816 Phone
(512) 454-3999 Fax
Email: phofer@advocacyinc.org
Email: bmitchell@advocacyinc.org

ATTORNEYS FOR PLAINTIFF

22

℀JS 44  (Rev. 10/06)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Raymond Fiala, individually and as representative of the Estate of Michael Fiala

### DEFENDANTS
James E. Smith, Susan Jansa, R.N., Ann Owens, R.N., Amber Riddle, Michael Fontenot

**(b)** County of Residence of First Listed Plaintiff _____McLennan_____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____Wichita_____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Peter Hofer, Advocacy, Inc., 7800 Shoal Creek Blvd., Ste. 171-E
Austin, Texas 78757 Phone: (512) 454-4816; Fax: (512) 454-3999

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): **42 USC § 1983**

Brief description of cause: **DEPRIVATION UNDER COLOR OF LAW OF MICHAEL FIALA'S SUBSTANTIVE DUE PROCESS RIGHT TO CARE AND SAFETY AND RIGHT TO BODILY integrity**

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) PENDING OR CLOSED (See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE  **1/29/07**

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # **WF000287**  AMOUNT **$350.00**  APPLYING IFP _____  JUDGE **R**  MAG. JUDGE **K**